UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KEVIN HUSBAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:21-cv-00964-SEB-MJD |
| | ) | |
| IMS PRODUCTIONS INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

After being terminated from his employment by Defendant IMS Productions Inc.,

Plaintiff Kevin Husband sued IMS Productions for wrongful discharge, discrimination,

and retaliation. Specifically, Mr. Husband claims his termination: (1) occurred in

retaliation for complaints he made about violations of Department of Transportation

("DOT") regulations under the Federal Motor Carrier Safety Administration ("FMCSA"),

(2) constituted disability discrimination, in violation of the Americans with Disability Act

("ADA"), based on medical tests suggesting he had experienced an onset of Multiple

Sclerosis, and (3) amounted to a wrongful discharge. We address the pending summary

judgment motion filed by IMS Productions which challenges the factual and legal

viability of each of Mr. Husband's claims.

## I.    SUMMARY JUDGMENT STANDARD

A party to in a civil dispute may move for summary judgment, which is a way of

resolving a case short of a trial, and "[t]he court shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247−48 (1986). "Material facts" are those that "might affect the outcome of the suit," and a dispute about a material fact is "genuine" when "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Johnson v. Manitowoc Cnty.*, 635 F.3d 331, 334 (7th Cir. 2011) ("A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party."). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Blythe Holdings, Inc. v. DeAngelis*, 750 F.3d 653, 656 (7th Cir. 2014) (internal citation and quotation marks omitted). In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

When deciding whether a genuine dispute of material fact exists, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* at 255; *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572 (7th Cir. 2021). However, the non-moving party "may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is

a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (2007). We are required to consider only the materials cited by the parties, Fed. R. Civ. P. 56(c)(3), and we are not required to "scour every inch of the record" for evidence that is potentially relevant, *Grant v. Tr. of Ind. Univ.,* 870 F.3d 562, 573-74 (7th Cir. 2017) (quoting *Harney v. Speedway SuperAmerica, LCC*, 526 F.3d 1099, 1104 (7th Cir. 2008). We do not "judge the credibility of the witnesses, evaluate the weight of the evidence, or determine the truth of the matter." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009). "The only question is whether there is a genuine issue of fact." *Id.*

Under our Local Rules, a movant's brief "must include a section labeled 'Statement of Material Facts Not in Dispute' containing the facts[] that are potentially determinative of the motion[,] and as to which the movant contends there is no genuine issue." S.D. Ind. L.R. 56-1(a) (internal subdivisions omitted). The nonmovant's brief similarly "must include a section labeled 'Statement of Material Facts in Dispute' that identifies the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment." S.D. Ind. L.R. 56-1(b). "Such statements should contain only material facts, 'not . . . mere background facts,' and must 'state facts, not the party's argument . . . '" *See Hinterberger v. City of Indianapolis*, 2019 WL 1439159, at *2 (S.D. Ind. Mar. 30, 2019) (Barker, J.) (quoting S.D. Ind. L.R. 56-1(a) cmt.; S.D. Ind. L.R. 56-1(b) cmt.). "'[E]ach fact' asserted in a brief must be supported by a 'specif[ic]' citation to the record." *Id.* (quoting S.D. Ind. L.R. 56-1(e)). The court "has no duty to search or consider any part of the record not specifically cited" in this

manner. *Id.* (citing S.D. Ind. L.R. 56-1(e)). The "movant's facts are admitted unless the non-movant 'specifically controverts' them in its factual statement, shows them to be unsupported, or demonstrates that reasonable inferences can be drawn in its favor." *Hinterberger v. City of Indianapolis*, 966 F.3d 523, 527 (7th Cir. 2020) (citing S.D. Ind. L. R. 56-1).

## II.    PROCEDURAL HISTORY

Mr. Husband originally filed his complaint against IMS Productions on July 1, 2020, in the Western District of Pennsylvania, alleging wrongful discharge and retaliation in violation of the Surface Transportation Assistance Act ("STAA"), disability discrimination in violation of the ADA, wrongful discharge in violation of Pennsylvania common law, and violations of the Pennsylvania Human Relations Act. The case was transferred to our court on April 19, 2021, pursuant to a grant of IMS Productions' Motion to Transfer Venue.

## III.    FACTUAL BACKGROUND

Mr. Husband's suit against IMS Productions seeks to recover for what he alleges were his wrongful discharge and retaliation against him.[1] In his "Statement of Material Facts in Dispute," he does not dispute the factual averments regarding the parties' backgrounds and his work performance as set forth by IMS Productions in its statement of the

---

[1] Mr. Husband has never amended his original complaint, though, in his Statement of Claims filed on February 17, 2022, he included "a cause of action for retaliatory discharge under Indiana law," or, alternatively, under Pennsylvania law. Docket No. 46, at 1. These claims are addressed in IMS Productions' motion for summary judgment.

4

undisputed material facts. *See Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994). Thus, we accept IMS Productions's factual averments in regard to the parties' backgrounds and Mr. Husband's employment performance because he has either admitted them, not specifically disputed them in his factual statement, shown them to be unsupported in the record, or demonstrated that reasonable inferences cannot be drawn from them in his favor. *Hinterberger*, 966 F.3d at 527 (citing S.D. Ind. L. R. 56-1). Much of what follows, therefore, is taken directly from IMS Productions's "Statement of Material Facts Not in Dispute," as further detailed below. *Hinterberger*, 2019 WL 1439159, at *1.

## A. THE PARTIES AND THEIR EMPLOYMENT RELATIONSHIP

IMS Productions is an audio and video production company based in Indianapolis, Indiana. Up until 2020, IMS Productions provided video editing, studio and green room space, cinematography direction, graphic design, sound design, mobile production facilities and satellite uplink trucks, and other similar services to customers across the United States. The mobile production facilities of IMS Productions were deployed  to broadcast sporting and other events worldwide, such as IndyCar races, Professional Bull Riders events, NFL football games, Indiana Pacers events, and Mecum Auto Auctions. IMS Productions and its executive management team operate from their headquarters in Indianapolis, Indiana.[2]

---

[2] IMS Productions neither rents nor owns any property in Pennsylvania and maintains no Pennsylvania offices. IMS Productions does not maintain any bank accounts in Pennsylvania, nor does it target any Pennsylvania print, television, or radio advertising. It has no employees in

In August of 2018, IMS Productions purchased the assets of Calhoun Satellite

Communications, Inc. ("Calhoun") out of bankruptcy and transferred the purchased assets

from Pennsylvania to Indianapolis. Along with the asset purchase, IMS Productions

agreed to hire Mr. Husband, who was one of the former owners of Calhoun, to serve as

the Director of Satellite Communication Sales and Operations for IMS Productions. In

this role, Mr. Husband was responsible for achieving the IMS Productions Satellite

Communications department's gross revenue, sales, and net contribution goals, along

with other duties, such as servicing clients, maintaining the customers from Calhoun,

developing new customer relationships, building a budget, monitoring and controlling

expenses, overseeing the team to support such efforts, and driving a specific satellite

uplink truck, referred to as the "TX4," as needed to event locations throughout the United

States. Mr. Husband reported directly to the President of IMS Productions, Kevin

Sublette. Although Mr. Husband continued to reside in Pennsylvania, his email signature

reflected IMS Productions's Indianapolis, Indiana address as his business address. At the

time Mr. Husband began working for IMS Productions, he had no medical issues that

would prevent or otherwise interfere with his ability to perform the duties related to his

role.

However, while employed with IMS Productions, Mr. Husband consistently

underperformed on his assigned responsibilities. He failed to achieve his department's

---

Pennsylvania, has never employed anyone in Pennsylvania, and, aside from Mr. Husband, has
never employed an individual who lived in Pennsylvania while working for IMS Productions.
Moreover, IMS Productions maintains all its employment records—including those related to the
Mr. Husband's employment and termination—at its headquarters in Indianapolis, Indiana.

revenue, sales, and budgetary goals, for example. For the year 2019, Mr. Husband projected a $434,688 profit for his department, but revenues fell significantly below this goal, to wit, by $634,959, which was fifty percent less than his projected goal, and expenses exceeded the target by $140,533, which was seventeen percent over budget. Thus, instead of a $434,688 profit, Husband oversaw a $339,557 loss, and, despite his revenue goal for new business of $490,000, he managed only $40,500 in new business.

IMS Productions experienced consistent problems as well with Mr. Husband's misuse of his credit card and issues with his expense reports. He regularly exceeded the $5,000 limit on his company-issued credit card, even though all other similarly positioned employees managed to operate within the imposed limits. Mr. Husband also utilized the card for airfare and other travel he arranged personally, despite IMS Productions's policy of booking travel directly through IMS Productions's Concur travel program. Indeed, he regularly purchased first-class airfare tickets, which would not have been authorized had he purchased the tickets through IMS Productions and pursuant to the policy. When confronted in August of 2019 with the issue of his unauthorized first-class ticket purchases, Mr. Husband allegedly lied about them. Mr. Husband also frequently purchased supplies and equipment directly with his credit card rather than following company protocols requiring that such purchases be run through the shop manager, Mike Rapp. Mr. Husband also routinely failed to timely submit certain expense reports.

In addition, Mr. Husband engaged in poor billing and collections practices, regularly failing to provide necessary and complete billing details and often causing delays in billing. Indeed, customers often had to request invoices directly from IMS Productions,

7

rather than Mr. Husband's managing this documentation. Mr. Sublette and others had to make specific requests for details from Mr. Husband for purposes of booking events, including customer names, contact information, location and dates of the event, and pricing—details that should have been provided sua sponte by Mr. Husband during the booking process. IMS Productions produced many examples of this type of incomplete, inadequate, incorrect communication, i.e., an IMS Productions employee repeatedly being required to request billing information from Mr. Husband, even after events had already occurred. Mr. Husband also failed to conduct follow-up efforts to collect on various delinquent invoices. Company practices and procedures included the distribution of reports of accounts, including delinquent accounts, to each department head, enlisting them to ensure that payments were made in a timely fashion; Mr. Husband was responsible for contacting certain customers listed on these monthly reports, but, by the end of October of 2019, at least ten of his customers' invoices were past due, dating from September 2018, and totaling more than $53,000. Mr. Husband never attempted to collect on any of those delinquent accounts. Mr. Husband also failed to timely report his mileage for purposes of fuel tax reporting. Fuel tax reporting is a legal obligation of IMS Productions, and reports for miles driven in each state must be maintained by IMS Productions and fuel tax paid on those miles. Mr. Husband, however, was repeatedly late in providing trip reports identifying his mileage amounts as well as his fuel receipts, creating a risk of penalties being imposed on IMS Productions. He was routinely late—and at times entirely non-responsive—despite specific requests by IMS Productions that he provide this information.

Because of his many performance deficiencies, Mr. Husband and Mr. Sublette negotiated a "Correction Plan for Kevin Husband," dated August 30, 2019, including a three-month deadline within which he must achieve the following improvements:

- "Stop sending cryptic emails and text[s]. Be clear in your communications to the office and clients"
- "Stop buying First class airline tickets"
- "Stop buying airline tickets online you must use [C]oncur"
- "Stop buying items online that can be sourced through Mike Rapp"
- "Stop showing up late on IndyCar events. You must arrive the day prior to the first air date in time to set up and fully fax prior to the normal scheduled workday ending."
- "Stop last minute shipping when possible. I understand that we can't prevent all of this but please work on it."
- "Stop accepting or telling clients that we can't cover the event without first clearing it with Colin."
- "Start competing bid sheets for all jobs. These must be sent to Colin and Nancy even if the show does not happen. We need to track the potential business."
- "Start sending contracts to clients."
- "Start over communicating."
- "Start being a team player."
- "Start [s]ending me your travel schedule to include clients that you are meeting with. After the meeting is over, I need to understand how the meeting went and what potential business there is."
- "Start using [C]oncur to book all travel unless you are traveling on a voucher."
- "Start using vouchers for all sales related business trips."
- "Start communicating when you will arrive on site and make sure that if you are going to be late that the team on site knows it."
- "Start submitting your expense reports twice a month."
- "Start submitting [t]ech [r]eports on all events within 24 hours of the show ending."
- "Start SELLING. Show me your plan"
- "Schedule with Steve and Jason time to go though each of the TX trucks and give me a plan."

Docket No. 49-3, at 69. The Correction Plan directed Mr. Husband to immediately
undertake these corrective efforts; to facilitate the improvement process, Mr. Sublette
planned to conduct reviews every thirty days with Mr. Husband to determine the steps
still needing to be accomplished. If Mr. Husband's performance did not improve
consistent with the Correction Plan, additional discipline, including possible termination,
would result.

Even after the adoption of the Correction Plan, Mr. Husband's performance came up
short of IMS Productions's stated expectations. On one occasion, for example, Mr.
Husband dispatched a satellite truck to New Orleans for a September 29, 2019, NFL
Thursday Night Football broadcast, even though the customer had never confirmed the
engagement for that event and was not expecting IMS Productions's involvement; as a
result, the IMS Productions truck was required to drive back to Indianapolis without
performing any services. Despite repeated reminders, Mr. Husband's failures to provide
contracts, agreements, and even minimal pricing information prior to events continued.
Customers were still being required to initiate requests for invoices for events that had
previously occurred. Mr. Husband's inattentiveness and lack of diligence cost IMS
Productions both in terms of lost revenue and actual expenses; Mr. Husband on occasion
also incurred vendor costs on behalf of a customer which could not be billed to the
customer. Mr. Husband also failed to timely submit his 2020 budget worksheet, despite
numerous requests and reminders by his co-workers. Frustrations by IMS Productions's
employees over Mr. Husband's negligent/indifferent work practices caused some to

inquire as to why Mr. Husband had not been terminated long ago based on these performance deficiencies.

## B.  PLAINTIFF'S TERMINATION OF EMPLOYMENT

Consistent with the Correction Plan, Mr. Sublette undertook various discussions with others on the management team about Mr. Husband's subpar performance, keeping Mr. Husband apprised in the process. In addition, Mr. Sublette periodically met directly with Mr. Husband following the adoption of the Correction Plan, repeatedly informing Mr. Husband that he was continuing to fall short of their expectations.[3] On November 12, 2019, Mr. Sublette terminated Mr. Husband's employment during a phone call with him, utilizing the Correction Plan to guide his discussions with and criticisms of Mr. Husband. Mr. Sublette had determined that termination of Mr. Husband's employment was required after "having seen no sales on the board for [Mr. Husband] and witnessing no improvement by [Mr. Husband] in sales or timely submitting information to bill customers." Docket No. 49-1, at 4. Mr. Sublette outlined to Mr. Husband the reasons for his termination, noting the various areas of deficiencies on the copy of the Correction Plan, which included his failure to complete bid sheets for jobs to track potential

---

[3] Mr. Husband's Statement of Material Facts in Dispute includes his assertion that the performance plan was a "farse as none of the meetings referenced therein occurred." Docket No. 51, at 4. In support of this statement, Mr. Husband cites twenty-one passages in Mr. Sublette's deposition testimony that relate to the weekly meetings Mr. Sublette conducted with Mr. Husband, during which he communicated his job expectations and Mr. Husband's many failures to meet those standards. There also were weekly meetings between Mr. Sublette and Mr. Wensel and Nancy Ochoa, the Director of Finance, during which Mr. Sublette received regular feedback concerning Mr. Husband's failures to meet their expectations. Mr. Husband's description of the plan as a farce is once again a conclusory allegation not deserving of inclusion in the factual recitation.

business, his failure to send contracts to clients, his failure to forward his travel schedule and communications about how meetings went with potential customers, and his failure to develop a plan to begin selling. Mr. Husband's termination preceded the three-month deadline specified in the Correction Plan.[4]

In his Statement of Material Facts in Dispute, Mr. Husband claims that Mr. Sublette had "no idea or concern about whether [Mr. Husband] had in fact addressed and/or improved the matters referenced in the plan" when he terminated Mr. Husband's employment. However, once again, the portions of Mr. Sublette's deposition cited by Mr. Husband as support for this statement do not support this conclusion. Instead, that evidence actually establishes that Mr. Sublette never addressed Mr. Husband's cryptic communications following the adoption of the Correction Plan on August 30th, neither did Mr. Sublette know or have information concerning whether Mr. Husband had continued to buy first-class plane tickets or other things online without going through Mike Rapp or whether Mr. Husband required the company to pay for last minute

---

[4] Mr. Husband references in his brief in opposition to the summary judgment motion an award he allegedly received "for exceptional job performance in the month immediately preceding the creation of the correction plan," but this award was neither mentioned in his complaint, nor referenced at any point during discovery. *See Davis v. Munster Med. Research Found., Inc.*, 213 F. Supp. 3d 1074, 1081 (N.D. Ind. 2016) (striking evidence of facts disclosed for the first time at summary judgment). Indeed, the only "evidence" Mr. Husband provides about this award is a declaration he filed in his Brief in Opposition to Summary Judgment—a declaration not made under penalty of perjury—stating only that he received an award for his job performance sometime in August of 2019. *See Scherer v. Rockwell Intern. Corp.*, 975 F.2d 356, 361 (7th Cir. 1992) (explaining that argument in a brief is not evidence). Accordingly, we have not included this in the facts considered on summary judgment. However, we do note for the record that IMS Productions provided a declaration by a Human Resources employee who issued this "award" to Mr. Husband, explaining that it was a certificate given to all employees of IMS Productions to mark their one-year anniversary with the company.

shipping costs, or whether he showed up late to IndyCar events, or failed to clear events with Mr. Wensel before communicating specific responses on behalf of IMS Productions to clients. The designated deposition testimony does, however, confirm that, as Mr. Sublette was outlining to him the reasons for his termination, he made notes on the Correction Plan highlighting areas where Mr. Husband was not doing his job; these included, specifically, Mr. Husband's failures to complete bid sheets for all jobs (which area of concern Mr. Sublette had mentioned to Mr. Husband between August 30th and his termination on November 12th), to send contracts to clients (also communicated to Mr. Husband during their weekly meetings and by members of Mr. Sublette's team), to submit his travel schedules to Mr. Sublette, to engage in overcommunicating, and the "big one" (per Mr. Sublette), to begin selling pursuant to a sales plan. Docket No. 51-2, at 12. These periodic meetings between Mr. Husband and Mr. Sublette as well as the termination call all occurred by phone, so no written record exists as to what precisely what was said. Mr. Sublette explained his decision to fire Mr. Husband prior to the three-month deadline based on Mr. Husband's failure to make any progress on the big items or to correct even the easiest, most straightforward problems, such as sending out contracts or bid sheets, and improving his "woefully off" sales numbers to acceptable levels. *Id.* at 13. Mr. Sublette testified that he did not believe that Mr. Husband was ever going to change.

Following his termination of employment on November 12, 2019, Mr. Husband filed a second, whistleblower retaliation complaint with the U.S. Department of Transportation against IMS Productions. Several days later, Mr. Sublette was notified of this complaint

by IMS Productions's Head of Human Resources. DOT investigated Mr. Husband's complaint, which resulted in a decision, as described by Mr. Husband, requiring IMS Productions "to take corrective action," (Docket No. 51, at 8), based on Mr. Sublette's testimony that DOT had discovered driving logs that were not filed, or were filed incorrectly, "a lot of it . . . under Kevin Husband." Docket No. 51-2, at 18. Indeed, IMS Productions adduced evidence showing that for the 2019 calendar year, Mr. Husband had logged only a handful of days into his logging device, regularly reflecting his duty status as either "off duty" or "driving" over several weeks at a time. For example, Mr. Husband's driving logs for the period May 6, 2019, through June 2, 2019, reflected twenty-four hours of "driving" logged. *See, e.g.*, Docket No. 49-1, at 119−147. Mr. Sublette testified that he was not aware of any citation, fine, or negative repercussion issued against IMS Productions based on the DOT investigation; in fact, the only corrective action required by DOT based on the investigation was that IMS Productions "do better as far as filing our DOT logs." *Id.*

## C. FACTS RELEVANT TO THE STAA RETALIATION CLAIM

Mr. Husband's Statement of Material Facts in Dispute highlights his dispute with IMS Productions over alleged violations of the DOT's hours-of-service driving regulations, his alleged medical disability, and his termination of employment. We begin our analysis by addressing the driving hours issue, to wit, his claim that he "was told that he was required to drive even though doing so would violate DOT regulations." Docket No. 51, at 2. Mr. Husband's source for this allegation is his own deposition testimony regarding a

14

conversation between himself and Mr. Sublette that occurred either on the Friday or Saturday of the 2019 Indianapolis 500 event, when Mr. Husband informed Mr. Sublette that, if he were required to drive the IMS Productions's truck to the next scheduled event set to occur in Detroit the following weekend, he would exceed his maximum driving hours limitation. Docket No. 51-1, at 18.

Reliance on one's own statement as proof of a claim is a thin reed, indeed. "'Self-serving' deposition testimony may satisfy a party's evidentiary burden on summary judgment." *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010) (citing *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003)). However, even if admissible, and sufficient, the evidence falls short here as proof of Mr. Husband's theory of relief since Mr. Husband has never established that Mr. Sublette actually ever instructed him to drive to/from Detroit in violation of DOT regulations. Mr. Husband's statement evidences no more than a warning, when he said that, if he were required to drive the trip to/from Detroit, his hours would exceed the permissible statutory limit. Mr. Husband in fact could not recall whether he actually did drive to Detroit on that occasion or how he managed to get himself to that city. Docket No. 51-1, at 18. When specifically asked during his deposition whether he knew the date and time he would have been required to arrive in Detroit, Mr. Husband said that he "assum[ed] it was Wednesday afternoon or Thursday morning." *Id.* Mr. Husband has produced no evidence establishing that, Mr. Sublette did, in fact, direct him to make this drive, recounting that Mr. Sublette's only response to Mr. Husband's remark was "[t]his is ridiculous," after which, he walked away. *Id.* When

asked if he remembered anything else about that conversation, Mr. Husband could recall nothing else.

IMS Productions does not dispute that Mr. Husband had expressed his concerns to Mr. Sublette at some point during the days leading up to the Indianapolis 500 event regarding his potentially running out of hours under the hours-of-service provisions of the Federal Motor Carrier Safety Regulations. However, sometime thereafter, Mr. Sublette informed Mr. Husband that he did not need to arrive in Detroit for the race the following weekend until Thursday, which allowed him several days off to reset his hours before making the trip, and Mr. Husband had finished his Indianapolis 500 work by 10:00 p.m. on Monday, 27, 2019. Mr. Sublette has testified that neither on this occasion nor any other occasion did he ever order Mr. Husband to drive in excess of his legal operating hours limitations.[5]

Mr. Husband, again relying on only his own testimony, maintains that, on multiple occasions, he raised the issue with Mr. Sublette that they could not have someone "operate an Uplink truck and then drive" because there are "only so many hours you're allowed to work and you can't go over those hours." Docket No. 51-1, at 18. Mr. Husband describes Mr. Sublette's uniform response to be, simply, "[o]h, okay," but Mr. Husband

---

[5] We note that Mr. Husband has not specifically controverted any of these factual averments by IMS Productions regarding his conversations with Mr. Sublette. Accordingly, "if a material fact is not disputed (or if there is no evidence that controverts the fact), the district court is entitled to know that up front, without first having to examine citations to evidence having only marginal bearing on the question." *Hinterberger*, 2019 WL 1439159 at *4 (quoting *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000)). "[A] mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lantz*, 321 F.3d 680, 683 (7th Cir. 2003) (citing *Edward E. Gillen Co. v. City of Lake Forest*, 3 F.3d 192, 196 (7th Cir. 1993)).

contends that Mr. Sublette continued to require (unidentified) people to do so. *Id.* On

September 1, 2019, unbeknownst to Mr. Sublette, Mr. Husband had filed an initial

complaint with the FMCSA referencing "[a]nother incident of being told that [he] needed

to drive when I would be out of hours." *Id.* Accordingly to Mr. Husband, the conversation

precipitating the September 1, 2019, filing of his initial complaint occurred either a day

or two prior, i.e., August 30th or 31st of 2019. When asked about details of that

conversation, Mr. Husband could not recall whether it pertained to a job he had just

completed, or an as yet unperformed trip he was being requested to take. Mr. Husband

has admitted that, prior to his termination, he never informed anyone at IMS Productions

that he had filed this complaint with FMCSA. Mr. Sublette learned of the filing of the

FMCSA complaint only after Mr. Husband's employment had already been terminated.

In attempting to fill in some of the lapses in Mr. Husband's memory, IMS Productions

proffers that the event Mr. Husband participated in during this timeframe could only have

been the IndyCar event in Portland, Oregon. However, according to his own testimony,

Mr. Husband traveled by airplane to and from Portland, and a freelance driver operated

the TX-4 that Mr. Husband normally operated. Mr. Husband testified that, prior to their

departure to Portland, IMS Productions had wanted him to drive the truck to the next

event after Portland scheduled in California, but, after informing IMS Productions that he

would be out of hours by then, Mr. Husband was directed to find a location somewhere in

Portland where he could leave the truck, which the freelance driver would pick up. Mr.

Husband maintains there were numerous conversations (though neither the number nor

locations nor specific details could he recall) involving (unnamed, unidentified) drivers

who had complained to him that they could not work various events because doing so would cause them to exceed their driving limitations; Mr. Husband testified that he always passed along these complaints to Mr. Sublette. (This testimony clearly undermines Mr. Husband's representation that drivers were being forced to drive in excess of the hours limitations).

Mr. Husband introduced an email chain containing a portion of one of these conversations between himself and another truck driver/operator about running out of hours, specifically, a July 20, 2019 communication, between Robb Radford and Mr. Husband, Mr. Wensel, and Matthew Fishman discussing the need for an alternative plan for returning the truck to IMS Productions following an event in Des Moines, Iowa, because Mr. Radford was close to his hours limitations. Nothing in the email chain indicates, however, that Mr. Radford ever did actually drive in excess of his hours-of-service limitation; indeed, Mr. Husband's own interpretation of this email exchange was that it evidenced everybody working together to avoid any violations of such regulations. Mr. Radford confirmed in his sworn declaration that no one at IMS Productions, including Mr. Sublette, ever asked or required him to violate the hours-of-service regulations, and when Mr. Radford did get close to his hours-of-service limits, IMS Productions worked with him to avoid such a violation, usually by providing a substitute driver. Mr. Husband described his conversations with Mr. Sublette regarding other operators' alleged complaints as being "basically the same": he would inform Mr. Sublette that they could not have someone work a number of hours and afterwards drive

the truck, and Mr. Sublette replied: "[w]ell, that's just the way it is. We have to do it that way." *Id.*

In an October 28, 2019 conversation between himself and Mr. Sublette (a time when Mr. Husband was neither over his hours limitation nor close to the limit, since he had not driven during the prior few weeks of October and was not scheduled to drive during the beginning of November), Mr. Husband allegedly informed Mr. Sublette: "[Y]ou cannot do this. You can't have people working this many hours, and then driving a truck." *Id.* at 20. According to Mr. Husband, Mr. Sublette responded, saying, "[I'm] damned if I do, damned if I don't. Were just going to have to deal with it." [6] *Id.*

Despite his apparent impatience with Mr. Husband's persistent admonitions, Mr. Sublette has categorically denied ever making any statements to anyone indicating or

---

[6] Mr. Husband's Statement of Material Facts in Dispute includes many alleged quotes drawn from his own Complaint. For example, Mr. Husband states that "[a]fter complaining about the DOT violations, Sublette told Husband that '[he] should do [his] job and drive.'" Docket No. 51, at 2. The "fact" of this quote is not tied to any other source, indeed, not even to his own Complaint. Mr. Husband also contends that when he "responded that he was out of legal driving hours, he was told: 'Who the Hell else is going to do it? Just do your job and drive.'" *Id.* In support of this purported "fact," Mr. Husband again cites his Complaint and his own deposition testimony. Mr. Husband's attorney, in an obvious attempt to buttress his client's allegations, asked Mr. Husband during his deposition if the quotes in his Complaint were "true and accurate," to which Mr. Husband simply and generically replied, "yes." Docket No. 51-1, at 32. Conclusory allegations, such as this, will not defeat a motion for summary judgment by transforming them into "facts." *Thomas v. Christ Hosp. and Medical Center*, 328 F.3d 890, 892–93 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 888–89 (1990)). Plaintiff cannot "replace conclusory allegations of the complaint [] with conclusory allegations of [a deposition]." *Lujan*, 497 U.S. at 888; *see also James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020) ("Not once in the 24 years since *Ford* was decided have we allowed a represented party to resist summary judgment by submitting an affidavit swearing to the allegations in the complaint after significant discovery.") (parenthetical passage added)). Thus, we do not include these conclusory allegations in our recitation of the facts.

19

expressing his support for any violation of the hours-of-service regulations by Mr.
Husband or any other driver. According to Mr. Sublette, IMS Productions's procedure,
when faced with such hours limitations, was to provide substitute freelance drivers in
order to avoid committing any hours-of-service violations and to ensure full compliance
with applicable regulations. Whenever Mr. Husband asked to have a freelance driver fill
in for him, according to Mr. Sublette, IMS Productions provided one. Indeed, the 2020
budget contained a specific line-item amount covering expenses related to hiring
freelance drivers. The only occasion, per Mr. Sublette, when Mr. Husband specifically
raised the issue of his own hours limitation was during the 2019 Indianapolis 500.
Thereafter, while they were in Detroit, Mr. Sublette met with Mr. Husband to schedule
trips that Mr. Husband would be able to make as well as trips when IMS Productions
would need to subcontract with freelance drivers. Mr. Sublette further testified that he
would not have been aware at any given time of Mr. Husband's specific hours of service,
largely because Mr. Husband consistently failed to submit his travel schedule to Mr.
Sublette despite the Correction Plan.

In summary, based on a careful review of all the evidence, it is clear that no
regulatory violation of DOT hours-of-service limitations by IMS Productions ever
occurred. The chronology of events reveals that Mr. Husband was placed on a
performance improvement plan in light of his ongoing, subpar job performance. The very
next day, unbeknownst to Mr. Sublette or anyone else with IMS Productions, Mr.
Husband filed a complaint with the DOT alleging that he was being asked to drive
excessive hours. Mr. Husband undertook the practice of issuing regular cautionary

20

reminders to Mr. Sublette about the DOT limitations on hours-of-service limitations, while his job performance continued to be seriously deficient. Mr. Husband was terminated on November 12, 2019, by Mr. Sublette based on his unremedied poor job performance. Mr. Husband filed another complaint to the DOT following his termination alleging retaliation. Sometime thereafter, Mr. Sublette learned of Mr. Husband's complaints to the DOT, and the DOT investigated Mr. Husband's claims, determining only that some driving logs (mostly from Mr. Husband himself) were either not filed or filed incorrectly. There were no instances when Mr. Husband or any other driver was asked or required to drive excess hours. Mr. Husband then filed this lawsuit.

### D.  PLAINTIFF'S MEDICAL ISSUES

In mid-October of 2019, Mr. Husband was hospitalized with chest pain, numbness in his legs and face, and an inability to read and see. He testified that when these symptoms hit, he contacted either Mr. Sublette or Mr. Wensel to inform them that he had been hospitalized. Mr. Husband testified that he was grateful for their genuine concern for his health when they told him to take good care of himself. After he was discharged from the hospital, Mr. Husband returned to work that same day without restrictions. Mr. Husband's vague memory of a conversation in which someone expressed concerns about whether he was fit to return to work likely would have occurred (if at all) after Mr. Husband was already back at work. Mr. Sublette was aware that Mr. Husband had returned to work and never asked Mr. Husband to leave his post because of his medical condition. Whatever his still undiagnosed condition was, according to Mr. Husband, it resulted in no

limitations being imposed on his work or other activities. Though Mr. Husband's doctor allegedly advised him to take things easy and not drive until his condition was diagnosed, that curtailment was irrelevant because Mr. Husband had not been scheduled to drive prior to the hospitalization because the racing season had ended. When a last-minute need for a driver arose, Mr. Husband was asked if he wanted to handle the job; in response, he never mentioned anything to Mr. Sublette or Mr. Wensel about his having received potential diagnosis of multiple sclerosis. Thus, neither man questioned Mr. Husband about whether he was medically able to perform this last-minute run. As it turns out, Mr. Husband was never diagnosed with multiple sclerosis or any other serious disease either before or after his termination.

## IV.    DISCUSSION AND DECISION

IMS Productions argues that there was never a time when Mr. Husband was faced with a demand that he drive in violation of the hours-of-service limitations and refused to drive. Mr. Husband from time to time expressed cautionary admonitions regarding the trucking regulations, but they did not rise to the level of demands/requests that violations were in the offing or any other form of protected activity under the STAA; in addition, there was no causal connection between Mr. Husband's comments and his discharge. IMS Productions argues that the evidence establishes that he was discharged solely due to his well-documented, extensive job performance deficiencies. Mr. Husband maintains that the evidence establishes a prima facie case of retaliation as shown by the fact that the Correction Plan was adopted at the end of August 2019, immediately after Mr. Husband

had lodged his complaints to Mr. Sublette about hours-of-service violations, and again

when he was terminated, after he complained at the end of October of 2019.

## A.  RETALIATION CLAIM UNDER THE STAA

"In the early 1980s, random inspections by law enforcement officers around the

country revealed widespread violations of commercial motor vehicle safety

regulations." *Gaines v. K-Five Const. Corp.*, 742 F.3d 256, 263 (7th Cir. 2014) (citing

*Bettner v. Admin. Review Bd.*, 539 F.3d 613, 615 (7th Cir. 2008)); *see also Brock v.*

*Roadway Express, Inc.*, 481 U.S. 252, 258, 262 (1987)). "In response to this grim

revelation, Congress enacted certain protections in section 405 of the [STAA]." *Gaines*,

742 F.3d at 263 (citing *Bettner*, 539 F.3d at 615−16). "The premise of Congress's action

was that employees (e.g., truck drivers) are in the best position to identify safety

violations." *Id.* (citing *Bettner*, 539 F.3d at 615). "Congress wanted to encourage

employees to complain about safety violations when they see them." *Id.* (citing *Bettner*,

539 F.3d at 615). "Section 405 of the STAA therefore identifies categories of protected

activity, like complaining about safety issues, and makes it illegal for employers to

retaliate against their employees for engaging in such protected activity." *Id.* (citing 49

U.S.C. § 31105). Specifically, the provision forbids an employer from disciplining or

discharging an employee because the employee: (1) refuses to operate a vehicle because

the operation violates a commercial motor vehicle safety regulation, standard, or order, or

(2) files a complaint related to a violation of a commercial motor vehicle safety

regulation, standard, or order, or is perceived by the employer as having filed or is about to file such a complaint. 49 U.S.C. § 31105(a)(1).

In 2007, the STAA was amended to incorporate the legal burdens of proof set forth in 49 U.S.C. § 42121(b)(2)(B), under which a complainant, such as Mr. Husband, "need only make a prima facie showing, by a preponderance of the evidence, that his protected activity was a contributing factor in the adverse action taken against him; in the face of such proof, the employer must demonstrate by clear and convincing evidence that it would have taken the same action against the complainant in the absence of his protected activity." *Formella v. U.S. Dept. of Labor*, 628 F.3d 381, 389 (7th Cir. 2010). Should IMS Productions succeed in making such a showing, then Mr. Husband has the opportunity to show that IMS Productions's alternate reason for firing him is pretextual. *Gaines*, 742 F.3d at 263−64 (citing *Roadway Exp., Inc. v. U.S. Dep't of Labor*, 495 F.3d 477, 482 (7th Cir. 2007).

### i. PLAINTIFF DID NOT ENGAGE IN PROTECTED ACTIVITY UNDER THE STAA.

To establish that he engaged in protected activity under the STAA, Mr. Husband must show that he either: (1) refused to operate a vehicle because the operation violates a commercial motor vehicle safety regulation, standard, or order, or (2) filed a complaint related to a violation of a commercial motor vehicle safety regulation, standard, or order, or is perceived by his employer as having lodged such a complaint. 49 U.S.C. § 31105(a)(1). For the reasons explicated below, we find that Mr. Husband has failed to establish that he engaged in any such protected activity.

### 1. PLAINTIFF WAS NEVER REQUIRED TO DRIVE EXCESS HOURS.

As we have noted previously, Mr. Husband was never required to drive in excess of the hours-of-service limitations, so none of Mr. Husband's conversations or discussions with IMS Productions constituted a refusal by him to drive in excess of these limitations, such as would qualify him for protection under the STAA. To prevail on such a claim, Mr. Husband's evidence must establish that he did in fact refuse to operate a vehicle, and that his refusal to do so was because operation of the vehicle would have resulted in a violation of a motor safety regulation, standard, or order. 49 U.S.C. § 31105(a)(1)(B); *see also Calhoun v. U.S. Dept. of Labor*, 576 F.3d 201, 210 (4th Cir. 2009).

Here, the only conversation that could possibly be construed as embodying such a refusal by Mr. Husband to operate a vehicle occurred in August 2019 between himself and Mr. Sublette.[7] The scheduled racing event was set to occur in Portland, Oregon. Mr. Husband has admitted that he traveled out to Portland and back by airplane (thus, no driving) and that a freelance driver had been engaged by IMS Productions to drive the truck rather than Mr. Husband. Indeed, Mr. Husband has testified that, prior to their

---

[7] The May 2019 conversation does not include evidence of a refusal to drive. By the time the trip had to be made to Detroit, it was on the weekend following the Indianapolis 500 event. While it is not clear that the trip actually occurred, there was no risk of any hours-of-service violation since Mr. Husband was finished working the Indianapolis event by 10:00 p.m. on Monday, May 27, 2019. Pursuant to 49 C.F.R. § 395.3(c), a driver's hours are fully reset after 34 hours off-duty. This means Mr. Husband's hours would have been reset by 8:00 a.m. that Wednesday. Mr. Husband was not scheduled to be at the event in Detroit until Thursday, so no violation of the hours limitation would have occurred.

Regarding the conversation between Mr. Husband and Mr. Sublette at the end of October of 2019, it is undisputed that Mr. Husband was not scheduled to drive during the weeks prior to and after that conversation.

departure to Portland, IMS Productions had broached the subject of his driving the truck from Portland to the next event scheduled in California, but, after informing IMS Productions that he would be out of hours by then, Mr. Husband was directed to find a place in Portland where he could leave the truck for the freelance driver to pick up. Mr. Husband has himself characterized this accommodation as a "team effort" to prevent an hours-of-service violation. This testimony—coupled with Mr. Sublette's testimony that he never was aware at any given time of the specific tally of Mr. Husband's hours of service, largely because Mr. Husband consistently failed to submit his travel schedule to Mr. Sublette as required—does not establish a refusal by Mr. Husband to drive, despite being directed to do so by his employer. At best, it shows that Mr. Husband did not keep IMS Productions properly informed of his hours on an ongoing basis, and, when he did indicate that their plan for the Portland race would put him over his hours-of-service limitations, IMS Productions and Mr. Husband and others collaborated on a process to ensure that Mr. Husband did not drive in violation of such limitations. Mr. Husband has failed to prove that by refusing to drive he engaged in any protected activity.

### 2. PLAINTIFF NEVER MADE A REASONABLE, GOOD FAITH COMPLAINT ABOUT THE HOURS-OF-SERVICE LIMITATIONS.

Likewise, Mr. Husband has failed to establish that he filed a complaint, either with his employer or the DOT, related to a violation of a commercial motor vehicle safety regulation, standard, or order, or was perceived by his employer as having filed such a complaint with the DOT that resulted in any adverse employment action against him. 49

U.S.C. § 31105(a)(1). While this category of protected activity does not require proof of an actual violation, the Seventh Circuit has held that an employee's complaints qualify as protected activity only if they were reasonable and in good faith. *Gaines*, 742 F.3d at 269.

We first consider whether Mr. Husband's various conversations with IMS Productions raising cautions and admonitions generally about the hours-of-service limitations qualify for protection under the STAA. IMS Productions describes Mr. Husband's complaints to Mr. Sublette and other IMS Productions employees as nothing more than "vague, sporadic comments regarding nonspecific allegations of concerns he had regarding the hours of service," arguing that a "mere reference to the hours of service does not transform a statement into activity protected under the STAA." Docket No. 49, at 24. In advancing this argument, IMS Productions relies on a Fourth Circuit decision in which that court explains that "clearly there is a point at which an employee's concerns and comments are too generalized and informal to constitute 'complaints' that are 'filed' with an employer within the meaning of the STAA." *Calhoun*, 576 F.3d at 213 (quoting *Clean Harbors Envir. Servs., Inc. v. Herman*, 146 F.3d 12, 19 (1st Cir. 1998)). Because the Fourth Circuit was addressing a situation in which the plaintiff made no written or oral complaint to his employer, rather, only "sub silentio" complaints by "turning off air to the rear trailer" and "engaging in a prolonged inspection," the case is of limited value here since Mr. Husband's complaints to IMS Productions were primarily advanced orally, and were at least specific enough to "constitute 'complaints' that are 'filed' with [his] employer within the meaning of the STAA." *Id.* at 212−13.

27

However, Mr. Husband's alleged "complaints" still fail to qualify as protected activity because they were neither reasonable nor made in good faith. We have established that Mr. Husband was never required to drive beyond the hours-of-service limitations. In fact, Mr. Husband's failure to accurately record his hours and to inform Mr. Sublette of his precise schedule left Mr. Sublette in the dark as to when precisely Mr. Husband might have been close to reaching his hours limitation. Mr. Husband's steady drumbeat of reminders to Mr. Sublette of these regulatory limitations, the frequency of which turned into a "Chicken-Little-the-sky-is-falling" series of comments and nothing more than that, do not constitute protected activity. Because there were no instances where Mr. Husband or any other driver, for that matter, was asked to drive excess hours, his ongoing remarks cannot fairly be viewed as reasonable complaints made in good faith.

Next, we consider whether Mr. Husband's filing of his two complaints with the DOT qualify as protected activity. Mr. Husband's complaint filed on September 1, 2019, with the DOT might have constituted protected activity had Mr. Sublette known about it when he terminated Mr. Husband's employment, but it is indisputably the fact that Mr. Sublette was unaware of Mr. Husband's complaint to the DOT until well after Mr. Husband had already been terminated. The filing of this complaint thus did not constitute protected activity under the STAA. When Mr. Husband filed this complaint on September 1st, it is more likely that he did so to distract from the fact that he had been put on a performance improvement plan. Moreover, Mr. Sublette had already been terminated when he filed his second complaint with the DOT in November of 2019; thus, that complaint does not qualify as protected activity leading up to Mr. Husband's termination.

We therefore rule that Mr. Husband has failed to establish that he had engaged in any protected activity under the STAA.

### ii. PLAINTIFF'S BEING PLACED ON A PERFORMANCE PLAN WAS NOT AN ADVERSE EMPLOYMENT ACTION.

Mr. Husband attempts to construe his performance improvement plan as an adverse employment action in order to prove retaliation for him having lodged his complaints to both DOT and IMS Productions. However, a performance improvement plan does not qualify as an adverse employment action because it does not constitute a "quantitative or qualitative change in the terms or conditions of employment." *Lauth v. Covance, Inc.*, 863 F.3d 708, 717 (7th Cir. 2017) (internal quotation marks and citation omitted); *see also Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 799 (7th Cir. 2014) (performance improvement plans are not adverse employment actions); *Cole v. Illinois,* 562 F.3d 812, 816 (7th Cir. 2009) (implementation of a performance improvement plan is not a materially adverse action). Mr. Husband's "discharge, on the other hand, clearly constitutes an adverse employment action." *Lauth*, 863 F.3d at 717. Thus, we move on to address the final element, and we will explain that even if Mr. Husband had engaged in protected activity, he has failed to establish causation between this activity and his termination.

### iii. EVEN IF PLAINTIFF WERE FOUND TO HAVE ENGAGED IN PROTECTED ACTIVITY, HIS TERMINATION WAS NOT THE RESULT OF ANY VIOLATION OF HIS RIGHTS UNDER THE DOT REGULATIONS OR ANYTHING OTHER THAN HIS PERFORMANCE DEFICIENCIES.

Even if Mr. Husband had established that he had engaged in the protected activity, he would have to show that that engagement was a contributing factor to his termination of employment. *Gaines*, 742 F.3d at 263. Mr. Husband is "not required to conclusively demonstrate that retaliation was the only—or even main—motivation." *Armstrong v. BNSF Railway Co.*, 880 F.3d 377, 382 (7th Cir. 2018) (citation omitted). "That does not mean, however, that [Mr. Husband] is not required to show that retaliation played at least some role in the decision." *Id.* This "contributing factor" standard is "merely a standard of causation, and it does not eliminate the need to demonstrate the existence of an improper motive." *Id.* "The analysis of whether the employer possessed an improper (i.e., retaliatory) motive is separate from the analysis of whether, and to what extent, that motive influenced the employer's actions." *Id.*

In order to make this showing, Mr. Husband must do more than "point only to the sequence of events—an [alleged protected activity] followed by a later dismissal—to show that the complaint was a contributing factor in the adverse employment action." *Holloway v. Soo Line R.R. Co.*, 916 F.3d 641, 644 (7th Cir. 2019) (involving a retaliation claim under the Federal Railroad Safety Act, which like the STAA, incorporates the burden of proof standards under from 42 U.S.C. § 42121(b)). As the Seventh Circuit has "often observed, suspicious timing alone is almost always insufficient to survive summary judgment*." Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011) (finding a plaintiff who was terminated just days after her complaint did not "overcome the general rule that suspicious timing alone is insufficient to support a claim of retaliation"); *see also Casna v. City of Loves Park*, 574 F.3d 420, 426 (7th Cir.

2009) (finding that suspicious timing created triable issue where employee was terminated *one day* after protected conduct). Instead, "[w]hen an employee's protected conduct is separated by a significant period of time from the adverse employment action, the proximity of the incidents does not support a causal connection between them." *Leitgen*, 630 F.3d at 675 (citing *Leonard v. E. Ill. Univ.*, 606 F.3d 428, 432 (7th Cir. 2010) (finding adverse employment action six months after protected conduct insufficient to establish retaliation claim); *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (seven weeks between events)).

### 1.   THERE IS NO CAUSATION LINK BETWEEN PLAINTIFF'S ALLEGED PROTECTED ACTIVITY AND HIS TERMINATION.

All Mr. Husband has been able to cite in support of causation is the proximity between his complaints and his November 12, 2019, termination, a matter of three months at most and two weeks at the least. *See Koziara v. BNSF Ry. Co.*, 840 F.3d 873, 877–78 (7th Cir. 2016) (involving a retaliation claim under the Federal Railroad Safety Act, which like the STAA, incorporates the burden of proof standards under from 42 U.S.C. § 42121(b)). However, as previously explained, this proximity alone is insufficient to survive summary judgment. The case Mr. Husband relies on in his attempt to create a triable issue based on the timing involved an employee who was terminated *one day* after lodging specific safety complaints regarding her truck's condition and her potential hours-of-service violation. *Logan v. B H 92 Trucking, Inc.*, 19-CV-1875, 2022 WL 198806, at *7 (N.D. Ill. Jan. 21, 2022). In contrast, Mr. Husband had months and/or

weeks between his various complaints and the adverse employment action against him.

Mr. Husband's situation more closely resembles the circumstances in *Leitgen v. Franciscan Skemp Healthcare, Inc.*, in which the Seventh Circuit determined that an interval of just a few days between the plaintiff's complaint and her termination was not sufficiently proximate to establish a triable fact on causation, especially since the employee had apparently complained about the same issue on multiple prior occasions, similar to Mr. Husband. The court ruled that because the plaintiff had lodged multiple complaints to her employer, she was required to proffer a valid explanation for why her most recent complaint "suddenly trigger[ed] retaliation." 630 F.3d at 675. Similarly, Mr. Husband has provided no such explanation here.

## 2. PLAINTIFF'S TERMINATION OF EMPLOYMENT WAS NOT THE RESULT OF RETALIATION FOR HIS ENGAGEMENT IN ANY PROTECTED ACTIVITY.

Moreover, "temporal proximity alone will not support an inference in the face of compelling evidence that [the employer] encouraged safety complaints." *Moon v. Transport Drivers, Inc.*, 836 F.2d 226, 229 (6th Cir. 1987). The undisputed evidence before us reveals that Mr. Sublette not only did not know but could not have known when Mr. Husband was approaching his hours-of-service limits in large part because Mr. Husband's compliance with the rule that accurate driving logs be filed on a periodic basis was rare. In addition, he rarely submitted his travel schedules to Mr. Sublette as required. As a result, when Mr. Husband did inform someone at IMS Productions that he was approaching his hours-of-service limits, IMS Productions's procedure was to hire a

substitute freelance driver to take Mr. Husband's (or another employee's) place. We know of no instance when Mr. Husband required a substitute driver that one was not hired. Indeed, IMS Productions maintained a specific budget allocation to cover the hiring of freelance drivers. Mr. Husband himself testified that he would work in cooperation with other IMS Productions employees to reach a solution when a driver was approaching his/her hours limit.

IMS Productions has also provided a legitimate, nonretaliatory basis, well supported by unrebutted evidence, for Mr. Husband's discharge: his protracted, well-documented history of subpar job performance, despite the improvement plan to which he agreed. Mr. Husband maintains that his poor job performance is a pretextual reason as evidenced by the suspicious timing of this termination, given that Mr. Sublette did not allow the full ninety days set out in the performance plan to run before he terminated Mr. Husband's employment. In addition, Mr. Sublette never indicated that Mr. Husband was failing to meet every single directive listed on the performance plan. These factors do not carry the full weight of Mr. Husband's evidentiary burden, however. Mr. Husband must succeed in identifying "specific facts" that are supported by admissible evidence and demonstrate that IMS Productions's reason "is [a] lie, specifically a phony reason for some action." *Harden v. Marion Cty. Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir. 2015). Mr. Husband "has not cited any evidence, other than his own speculation, that might indicate [IMS Productions] used the litany of complaints and the documented history of his communication [and performance] issues as a cover for its retaliatory motive." *Lauth*, 863 F.3d at 717. "That speculation is insufficient to raise a question of fact, particularly

in light of the [IMS Productions'] consistent, longstanding, and progressive concerns about his behavior." *Id.* (citing *Argyropoulos*, 539 F.3d at 737) (mere speculation that employer lied to conceal true motives insufficient to withstand summary judgment)).

Thus, we hold that IMS Productions has "presented evidence that it honestly believed" that Mr. Husband's job performance was inadequate and unacceptable, and that his faltering efforts would continue, so as never to meet its legitimate work expectations. *Bettner*, 539 F.3d at 623. The Court's "task is not to determine whether [IMS Productions] was correct in its view, but whether the record establishes that it had a reasonable, non-retaliatory basis for its decision." *Id.* Accordingly, summary judgment in favor of IMS Productions must be granted as explained above.

## B.  DISABILITY DISCRIMINATION CLAIM

Under the ADA, IMS Productions was prohibited from discriminating against Mr. Husband "on the basis of [his] disability." 42 U.S.C. § 12112(a). To prove a violation of § 12112(a), a plaintiff must show that while he was employed: (1) he was disabled; (2) he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (3) there was an adverse employment action, and (4) the adverse action was caused by (due to) his disability. *Monroe v. Ind. Dept. of Trans.*, 871 F.3d 495, 503 (7th Cir. 2017) (quoting *Roberts v. City of Chi.*, 817 F.3d 561, 565 (7th Cir. 2016)).

### i.  DISABILITY

Under 42 U.S.C. § 12102(1), "[t]he term 'disability' means . . . (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." IMS Productions argues that Mr. Husband neither had a disability nor a record of any such impairment, indeed, that he has never even identified his alleged disability. At most, according to IMS Productions, the Complaint references a single, potential symptom that may indicate an onset of multiple sclerosis, but no diagnosis of multiple sclerosis or any other disease afflicting Mr. Husband was ever made, either before or after his termination.

We find based on the record before us no mention of an established medical diagnosis of Mr. Husband's isolated symptoms. Even if a medical diagnosis had been made and even if, as he asserts, someone at IMS Productions (he does not know who) expressed doubts as to whether he was able to return to work (though he had already returned when the alleged comment was made), "the existence of a medical condition alone is insufficient to satisfy the ADA." *Fleishman v. Contl. Cas. Co.*, 698 F.3d 598, 607 (7th Cir. 2012). As we previously ruled, "it is not enough simply to suffer from an impairment; rather, that impairment must substantially limit a major life activity." *Monroe v. State of Indiana*, 2016 WL 1270202, at *7 (S.D. Ind. Mar. 31, 2016) (Barker, J.).

Mr. Husband has entirely failed to produce any evidence showing that his undiagnosed condition substantially limited any major life activity; in fact, in his deposition he testified that whatever his undiagnosed condition was, no work restrictions

were ever imposed on him by his doctor and the condition—whatever it was—did not substantially limit his work or other activities. Mr. Husband's failure to respond to any of these deficiencies in his theory of liability and/or proof defeats his claim because a "wholesale failure to respond to an opposing argument results in waiver." *Citizens for Appropriate Rural Roads, Inc. v. Foxx*, 14 F. Supp. 3d 1217, 1230 (S.D. Ind. 2014) (Barker, J.).

Thus, Mr. Husband's disability claim under 42 U.S.C. § 12102(1)(C) rests entirely on his allegation that he was regarded by IMS Productions as having a disability of some sort. To satisfy this prong, Mr. Husband must "offer evidence indicating that [IMS Productions] believed, rightly or wrongly, that he had an impairment that substantially limited one or more major life activities." *Miller v. Illinois Dept. of Transp.*, 643 F.3d 190, 195 (7th Cir. 2011). The evidence must show either that IMS Productions mistakenly believed him to be impaired or that Husband was in fact impaired and IMS Productions mistakenly believed the impairment was substantially limiting. *Id.* On these issues, there is a complete dearth of support. What the undisputed evidence does establish is that IMS Productions knew Mr. Husband was back working on the very day of the health scare after he was discharged from the hospital, that the company never asked him to stop working, and that, rather than regarding him as impaired, they in fact sought to enlist him in driving a last-minute run that had come up unexpectedly. Mr. Husband's musing that he perhaps he should not have driven during this time does not qualify as evidence of a disability or a perceived disability nor does it create a genuine issue of material fact. Mr. Husband actually admits there were no scheduled driving jobs

immediately prior to his hospitalization, and that thereafter, when one arose, he was offered the chance to take it by IMS Productions. "If the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed." *Yanick v. Hanna Steel Corp.*, 653 F.3d 532, 548 (7th Cir. 2011) (quoting *Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006)). Mr. Husband's attempt to demonstrate that he was disabled at the time of his termination never achieves lift off here.

### ii. CAUSATION

Even if Mr. Husband had succeeded in proving that he suffered from a disability, or a perceived disability, he has not established the existence of a "genuine issue of material fact . . . regarding whether his disability was the 'but for' reason for the adverse action." *Kurtzhals v. County of Dunn*, 969 F.3d 725, 728 (7th Cir. 2020) (quoting *Monroe*, 871 F.3d at 504). Stated otherwise, Mr. Husband has failed to show that IMS Productions "would not have fired him but for his actual or perceived disability; proof of mixed motives will not suffice." *Serwatka v. Rockwell Automation, Inc.,* 591 F.3d 957, 962 (7th Cir. 2010).[8]

---

[8] We note for completeness that the ADA Amendments Act of 2008 changed the language of the statute from prohibiting discrimination 'because of' a disability to prohibiting discrimination 'on the basis of' a disability." *Kurtzhals*, 969 F.3d at 728 (citing Pub. L. No. 110-325, § 5(a)(1) (Sept. 25, 2008)). Over a decade later, it "remains an open question in this circuit whether that change affects the 'but for' causation standard we apply in these cases." *Id.* (quoting *Monroe*, 871 F.3d at 504); *see also Serwatka*, 591 F.3d at 962; *Roberts*, 817 F.3d at 565 n.1; *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 853 n.2 (7th Cir. 2015)). "[T]he parties in this case have not

"To show that disability discrimination was the 'but for' reason for the termination, a plaintiff can use either direct or circumstantial evidence." *Id.* Direct evidence would be an admission that the defendant fired the plaintiff on the basis of his disability, while circumstantial evidence may include: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Bunn v. Khoury Enter., Inc.*, 753 F.3d 676, 684 (7th Cir. 2014) (internal citations omitted). The Seventh Circuit has referred to these methods of proof as the "direct method" of proving disability discrimination, or "the 'indirect method' of proving disability discrimination by employing the burden–shifting method established in *McDonnell–Douglas Corp. v. Green*." *Monroe*, 871 F.3d at 504 (citing 411 U.S. 792 (1973)). However, the Seventh Circuit has "tried to move away from the many multifactored tests in employment discrimination cases and decide, when considering the evidence as a whole, 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge.'" *Id.* (quoting *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). In this case, "regardless of the method of proof used, we find there is not sufficient evidence to create a genuine issue of fact that [Mr. Husband's alleged] disability was the 'but for' cause of his discharge." *Id.*

---

argued that another causation standard should apply, so we will continue to apply the 'but for' causation standard." *Monroe*, 871 F.3d at 504.

Mr. Husband, again, has relied solely on timing to prove causation, but, as previously noted, this "will rarely be sufficient . . . to create a triable issue." *Silk v. Bd. of Trustees, Moraine Valley Community College, Dist. No. 524*, 795 F.3d 698, 710 (7th Cir. 2015) (quoting *Argyopoulos*, 539 F.3d at 734). Indeed, it is insufficient here for all the reasons we have addressed above in ruling on Mr. Husband's STAA claim. Mr. Husband's attempt to establish a prima facie case of discrimination on the basis of his disability is defeated by IMS Productions's legitimate, alternative basis for his termination. His evidence of pretext, which mirrors that argued in the context of his STAA claim, since it is "equally applicable to his ADA claim," falters for the same reasons. Docket No. 51, at 19. We again hold that Mr. Husband has "in no way show[n] that the legitimate nondiscriminatory reason offered by [IMS Productions] for [his] discharge was a lie or a sham to cover up discriminatory motives." *Monroe*, 871 F.3d at 505. Accordingly, summary judgment shall be entered in favor of the Defendant.

### C.  STATE LAW CLAIMS

In his Complaint, Mr. Husband appears to include a disability discrimination claim based on the Pennsylvania Human Relations Act and a wrongful discharge claim based on Pennsylvania common law. However, in his Statement of Claims, Mr. Husband has not included any reference to a Pennsylvania Human Relations Act claim, opting instead for "a cause of action for retaliatory discharge under Indiana law," or, alternatively, under Pennsylvania law. Docket No. 46, at 1. We address each of the state law claims in turn below.

### i.   PENSYLVANIA HUMAN RELATIONS ACT CLAIM

Clearly, by omitting any claim under the Pennsylvania Human Relations Act in his Statement of Claims, Mr. Husband has abandoned that theory of relief. *Jackson v. Regions Bank*, 2020 WL 4430588, at *4 (S.D. Ind. July 31, 2020), *aff'd*, 838 Fed. Appx. 195 (7th Cir. 2021) ("This Court has consistently held that failure to assert a claim in a Statement of Claims results in abandonment of that claim."). Further, in his brief opposing IMS Productions' summary judgment motion, Mr. Husband informed the Court that he "is not contesting IMS's motion for summary judgment on his Pennsylvania Human Relations Act claim." Docket No. 51, at 21 n.2. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 n.2 (7th Cir. 1996) (plaintiff abandoned claim after failing to respond to defendant's arguments relating to claim in motion for summary judgment). Because Mr. Husband has abandoned this claim, we grant summary judgment in favor of IMS Productions on the Pennsylvania Human Relations Act claim.

### ii.   PENNSYLVANIA WRONGFUL DISCHARGE CLAIM

In Mr. Husband's brief opposing summary judgment, he failed to respond to IMS Productions's arguments in support of summary judgment challenging his Pennsylvania wrongful discharge claim. IMS Productions argues that it is entitled to summary judgment because: (1) Mr. Husband was an Indiana employee, (2) IMS Productions properly terminated his at-will employment, and (3) a common law claim is not available to him since he has a statutory remedy available, i.e., the STAA. Mr. Husband's failure to respond signals "that [he] has abandoned th[is] claim." *Murray v. Golden Rule Ins.*

*Co./United Health Corp.*, 23 F. Supp. 3d 938, 955 (S.D. Ind. 2014); *see also Hughes v. City of Indianapolis*, 2012 WL 1682032, *1 (S.D. Ind. 2012) (summary judgment granted in favor of defendant where plaintiff failed to address arguments made by defendant "or otherwise present evidence to support her allegations"); *United States v. Turcotte*, 405 F.3d 515, 536 (7th Cir. 2005) ("unsupported and undeveloped arguments are waived"); *Marcavage v. City of Chicago*, 659 F.3d 626, 638 (7th Cir. 2011) (failure to respond to argument opposing party made on summary judgment constituted waiver of that argument).

IMS Productions's additional argument is also correct—that Mr. Husband's wrongful discharge claim under Pennsylvania law must fail as a matter of law. Mr. Husband does not contend that he was a Pennsylvania-based employee; thus, he is foreclosed from asserting a wrongful discharge claim under Pennsylvania law. *See, e.g., Hides v. CertainTeed Corp.*, 1995 WL 458786, at *2 (E.D. Pa. July 26, 1995) (granting motion to dismiss on an employment claim because the plaintiff was not employed in Pennsylvania); *Tucci v. CP Kelco ApS*, 2002 WL 31261054, at *3 (E.D. Pa. Oct. 12, 2002) (granting motion to dismiss, holding employment claim did not apply to Pennsylvania resident who worked out of Delaware office and could not establish that he was "based in" Pennsylvania). In addition, in a case where "an important public policy is involved," as Mr. Husband describes his STAA claim, "an employer may discharge an employee [under Pennsylvania law] where there exists a separate, plausible, and legitimate reason for doing so." *Cisco v. United Parcel Servs*., Inc., 476 A.2d 1340, 1343 (Pa. Super. 1984). Mr. Husband has not disputed his poor job performance record or that

his poor performance was not a legitimate or plausible reason for his termination. Lastly, the Third Circuit has "determined that Pennsylvania law does not recognize a common law cause of action for violating public policy if a statutory remedy exists." *Gillispie v. RegionalCare Hospital Partners Inc.*, 892 F.3d 585, 597 (3d Cir. 2018); *see McAlee v. Indep. Blue Cross*, 798 F. Supp. 2d 601, 605−06 (E.D. Pa. 2011) (dismissing common law wrongful discharge claim because plaintiff had statutory remedy under Uniformed Services Employment and Reemployment Rights Act). Mr. Husband's lack of success on his statutory claims under the STAA does not rescue his wrongful discharge claim. *See Gillispie*, 892 F.3d at 597−98 (affirming judgment on common law wrongful discharge claim where statutory remedy was available, even though the district court granted judgment on statutory claims because they were time-barred).

For all these reasons, summary judgment shall be granted in favor of IMS Productions on these claims as well.

### iii.   INDIANA WRONGFUL DISCHARGE CLAIM

Finally, we reject Mr. Husband's belated attempt to bring a claim for wrongful discharge under Indiana law. Mr. Husband never amended his complaint to include such a wrongful discharge claim under Indiana law, nor indicate such an intention prior to filing his Statement of Claims on February 17, 2022, six months past the deadline to seek leave to amend his Complaint. Because "a party's statement of claims is not a pleading . . . such a filing does not provide for expanding or amending a complaint." *Wilson v. Regal Beloit Am., Inc.*, 521 F. Supp. 3d 760, 772 (S.D. Ind. 2021). The reference in Mr.

Husband's brief opposing summary judgment to his contention that under Indiana law, a reasonable jury could find that he was wrongfully discharged is an irrelevant argument because he "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002) (citation omitted). Accordingly, Mr. Husband's attempt to advance this claim is unavailing.

## V.    CONCLUSION

We hold that as to all of Mr. Husband's claims, the undisputed evidence before us "is so one-sided that [IMS Productions] must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. We therefore **GRANT** Defendant's Motion for Summary Judgment [Docket No. 48] in its entirety. Final judgment shall issue accordingly.

IT IS SO ORDERED.

Date:    11/23/2022

*Sarah Evans Barker*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Thomas B. Anderson
Thomson, Rhodes & Cowie
tanderson@trc-law.com

James Anthony Eckhart
SCOPELITIS GARVIN HANSON LIGHT & FEARY
jeckhart@scopelitis.com

Alvin Jackson Finklea, III
SCOPELITIS GARVIN LIGHT & HANSON

jfinklea@scopelitis.com

John T. Pion
Pion, Nerone, Girman, Winslow & Smith
1500 One Gateway Center
Pittsburgh, PA 15222

William James Rogers
Thomson, Rhodes & Cowie
wrogers@trc-law.com